The first case on our calendar is Utica Mutual versus Fireman's Insurance. We'll hear from the attorney. Good morning, Your Honors. I'm Peter Chaffetz with Steve Schwartz and David Berman for Appellant. I've reserved two minutes, and in the time I have, I'm going to focus on our principal argument on appeal, which is that this case should never have gone to a jury because as a matter of law, the Gould's losses were below the underlying limit of the umbrella policies. We are not— This is on your appeal from denial of summary judgment? And denial of a directive verdict and denial of our post-trial motion for judgment. There was a jury verdict, correct? Yes. So the case—so we're reviewing a plenary judgment, not a summary judgment issue? Correct. But our position is the case should never have gone to the jury because as a matter of law, the contract so clearly precludes coverage that there's no reinsurance. So now that becomes an argument that as a matter of law, no reasonable jury could have found. Respectfully, Your Honor, no jury could have found that because as a matter of law, there was no question of fact to be resolved. Well, let's deal with that. The problem here is that the primary policies are missing. Yes. And the argument, as I understand it from the other side, is that there was at least a question of fact as to whether those primary policies had an aggregate limit. You relied, among other things, on the umbrella policies, which only have a primary—which only have an aggregate limit for property damage. They relied on other evidence, bookend policies that appeared to, among other things. Why wasn't that a question for the jury? Let me be totally clear. It is irrelevant. If they found those policies and those policies had aggregate limits, that would still not under the umbrella policies, because the umbrella policies are a standalone contract, an integrated contract, that have to be read on their four—within their four corners and they have to state what the attachment point is so that the umbrella carrier, who could well have been a different company from Utica—It just happens— So your position is that your client's liability is based only on the umbrella policy? Precisely. Precisely. And this loss is not within the coverage of the umbrella policies. Now I'm going to look—I'm going to turn to the relevant provision, and it will be helpful if you have that before you. It's at page 34 of our brief. Of the umbrella policy. Yes, of the umbrella—only the umbrella policy is relevant here. You can't look at any extrinsic evidence. There was an alternative argument that their allocation was unreasonable because of that factual question, but we're not appealing that. We're focusing on this contract. And the first clause, this contract has a definition of underlying limits. And this is a categorical limit on the coverage of this contract. And it says, the company shall be liable only for loss in excess of the underlying limit. And the definition of the underlying limit is comprised of two clauses. The first clause defines the underlying limit by reference to the applicable limits of primary coverage as stated in the schedule. The second clause, which is what they focus on, has only one possible purpose. It makes a—it contemplates a necessary arithmetic adjustment to the operation of the first clause. If the schedule of underlying limits includes an aggregate, as this policy does for property but not for bodily injury, if it includes an aggregate, you can't simply apply the aggregate to every claim that comes along. You have to reduce the amount stated in the schedule to account for losses that have been paid. Once the aggregate limit is exhausted, the underlying limit goes to zero, and all subsequent losses arising from any one occurrence flow directly to the umbrella policy. And if you read the clause in the way that I just described, you—it harmonizes both parts of the definition. It provides a predictable, commercially reasonable result in every case, and it works the way the parties obviously intended. The—any underlying limit that affects whether the umbrella policy is going to be triggered has to be stated in the umbrella policy. Now there's three—I'm going to turn to the textual argument that Utica makes next, and there's three defects there. First, the words just don't support it. They say because the second clause includes the word any, the parties must necessarily have agreed that any aggregate, whether it's stated in the schedule or not, can apply. But they read that second clause in isolation, and they ignore the fact that the reference to any applicable limit refers back to the first clause. Any applicable limit—those two clauses have to work together. There's no other way to read that. They also say, and this really is the linchpin of their argument, that the—an aggregate limit is not a limit applicable to any one occurrence, and therefore doesn't have to be scheduled. That's on page 37 of their brief, and it's just wrong. In most cases, in many cases, the aggregate limit will be the only applicable limit that could apply to determine coverage of the umbrella policy. The aggregate limit will apply to all the small claims after the policy has paid the aggregate limit. So if there's any purpose in scheduling any limit, which the party clearly contemplated, it applies with full force, and maybe even greater force, to the aggregate limit. They read the second clause to swallow the first. They read the second clause to erase the first, so that even though this policy has an aggregate limit for property and doesn't have an aggregate limit for bodily injury, they would give you the same result. It would cover both. So their reading negates one—the principal part of the clause, and it doesn't harmonize them. So under New York rules of construction, you have to reject that. Counsel, would you take a moment and talk about your objections to the course of the trial? Yes. I don't think my time will permit me to go to the late notice objections, we'll rely on the brief. But there couldn't—given the judges and Utica's, we think, incorrect assumption that everything hinged on whether it was reasonable to assume that there were aggregate limits in the underlying policy, that's the way it did go to the jury. It was the height of prejudice to take a finding of fact drafted by counsel, signed by two judges, and admit that finding to suggest to the jury that—as evidence that it was reasonable to imply those aggregate limits in the underlying policy. They said it was admitted not for the truth? Sorry? They said it was admitted not for the truth? That's what they say in their brief. That's not what they said to the judge when they proffered it. When they proffered it, they said, this will prove the reasonableness of what we did. Reasonableness was the key factual issue in the way that the case incorrectly went to the jury. And then, in closing argument, he said, these judges— What they argued was reasonable was that they said that the aggregate limits had been exceeded, right? Because they allocated some. That was part of the settlement. Yes. Okay. So, you're saying that it was admitted for that, for the truth of that? No, it was—there was no—that was an undisputed fact. It wasn't needed for that. Look at what he said. I may not have been clear. You're saying there's no aggregate limit. They offered the settlement and the stipulation signed by the judge to support their argument that there was an aggregate limit, because the settlement said that the aggregate limit had been exceeded, and the stipulation said, yes, that's reasonable. So, your argument, if I understand it, is that, yes, it was offered for the truth of a fact that you're saying is disputed. It was highly disputed. Yeah, okay. Just so that I'm clear that you have an issue, because I'm going to ask your adversary about this. Yeah. But, in addition, there was evidence before the jury that the missing policies contained aggregate limits. Your Honor— And the jury found that they did. That's why the judge denied our motion for judgment as a matter of law. But that issue— Let's assume— Did you ask whether the underlying policies had limits? Sorry? I didn't understand the jury ever to have been asked whether they found that the underlying policies had aggregate limits. I think they were asked whether it was reasonable for Utica to conclude that the underlying policies had aggregate limits. But I couldn't stress more that that is not a relevant inquiry on this appeal, because we are talking about whether the umbrella policy covers. Many cases have said that the terms—the limits scheduled in the declarations to an umbrella policy determine where that policy attaches, regardless of what the underlying policy says. I may be misunderstanding. I thought you were complaining that—and even if it went to a jury, the jury should have been asked, are there aggregate limits? Instead, they were—I thought your argument was that instead they were told simply to apply the follow-the-settlement principle. Am I mistaken? They should—we did—they should have been asked whether it was reasonable to find that there were aggregate limits in the umbrella policy attachment point on the assumption— We don't think that was a jury question, but the judge and Utica thought it was a jury question, and we asked for an instruction that the jury determine separately whether the umbrella policy covered, and that issue was never separately presented. Because there's a difference between asking the jury, well, were there aggregate limits in the policy, or was it reasonable to think there were aggregate limits in the policy? You're saying the first question is the one that should have been asked. Yeah, I think it was asked with respect to what was in the underlying policy, but they all were proceeding on a false assumption that if it was reasonable to think that the underlying policy covered, then it was also reasonable to, quote, allocate that loss to the umbrella policy. Let me ask you this. Assuming—just assume hypothetically that the policies were not missing, and the policies somehow surfaced, and there were aggregate limits in each of the policies in question, is your position that the umbrella coverage still did not apply? It still doesn't apply, because it says— What were they buying? They were buying catastrophic, high-level—they made pumps, pumps used in oil wells, in factories, refineries. They could easily—remember, this is 50 years ago. People didn't know about asbestos. They could reasonably have been looking for coverage for a catastrophic explosion caused by one of their pumps in one of the facilities. And by the way, many people—it's completely false for them to assert that it was unheard of to have product liability coverage with no aggregates, because in the USF&G case, there were $1.4 billion. Why didn't—why wouldn't the umbrella—I want to be sure I'm clear about your argument. If there were aggregate limits in the policies, why didn't the umbrella policies cover that? If there were aggregates in the policies, the umbrella—sorry, no. The umbrella policies only cover—you have to look—the loss must exceed the applicable underlying limit stated in the schedule. Since there's no aggregate limit stated in the schedule of the umbrella policy, it doesn't matter what the—you don't look at the policy under—the primary policy. We have an oil well that blows up and it's $100 million worth of damage. Yeah. Under your theory, no umbrella coverage. No, there would be umbrella coverage. That's exactly the situation where there would be individual claims. One claim. There's one claim for a gazillion dollars. One claim. Yeah. No umbrella coverage for that. These kind—yeah, there would be no umbrella coverage. These kind of policies— What were they buying? They were buying coverage for a catastrophic claim. Well, I just hypothesized to you a catastrophic claim and you say it's not covered. It would be covered—everything above $100,000 per person and $300,000 per accident would be covered. It would be all covered. Everything above $300,000 for that accident would be covered. That's the purpose of this kind of coverage. So if somebody had a million dollars in injury, you're saying they would be covered up to $700,000? If it was an individual, they'd be covered up to $900,000. If there were several people injured in that accident, everybody's claim above $300,000 coming from that one accident would go to that. And that was a very common kind of coverage and that's exactly what they were buying. I don't understand how the oil well gets covered under your theory. Well, the oil well explodes and let's say there's 20 people who have severe bodily injury. Nobody gets injured. Our $250 million facility goes up in smoke. Oh, well, there is an aggregate limit for property. If it were property damage that you just described, that would all be subject to the— that would go to the umbrella policy after the first $100,000. Your Honor, respectfully, it's not correct to suggest that this coverage structure would not be economical or sensible or something people could have bought. They bought $1.4 billion of products coverage without aggregates in USF&G. And Utica, according to your court's opinion in the Utica v. Clearwater case last year, Utica issued four years of coverage to Goulds without aggregate coverage. If 20 people are killed and a $300 million facility goes up in smoke, is there a—what does the umbrella policy cover? The umbrella covers everything that happened in that occurrence you just described in excess of $100,000 per person and $300,000 per accident. In certain years, they change the term to per occurrence. But what you described is an occurrence. It's a catastrophic occurrence. Umbrella policies cover catastrophic loss and those losses are very rare. We'll acknowledge that. And that's why coverage is so cheap. Even by 1960s standards, less than $6,000 was paid for the $10 million worth of umbrella coverage. $6,000 premium for $10 million. It's for that rare catastrophic event that exceeds those limits. All right. This is a good place to stop. You have reserved minutes for rebuttal. Thank you very much. We'll hear from Utica. Good morning. May it please the Court. William Sneed on behalf of the Appellee Utica Mutual. In reinsurance, second-guessing isn't a defense. Every reinsurance contract at issue here had a clause that said, claim settlements by Utica are binding on fireman's funds. It's a follow-the-settlements clause. There's a very strong— But as long as the underlying policy creates the obligation. Yes, in the first instance, Your Honor. But there's every case— Isn't that the problem? Why don't you start with their argument that the umbrella policy, which is the basis for their reinsurance obligation, has no aggregate limit for bodily injury? Their argument fails because it takes the follow-the-form clause, which means their obligation to us derives from our obligation to Gould, and says it trumps the follow-the-settlements clause, which this Court in Utica v. Clearwater said, when you're in the realm of what did Utica's coverage to Gould provide, what should Utica have done under that umbrella, they don't get to impose their interpretation on us. But your position is that even if Mr. Schwartz is correct, the follow-the-settlement theory trumps it. Absolutely trumps it. Their theory can't be reconciled with this Court's decision a year ago. This Court said in Utica v. Clearwater, if the insurer has a reasonable, good-faith basis for its settlement, and there is a follow-the-settlements obligation, and there is, the insurer could not even be liable to the policyholder, but the reinsurer would still be bound. But the insurer here has every interest in a settlement that passes on the insurance obligation to its reinsurer. That's quite different from the insurer deciding that, well, the person was injured, we're going to settle with them, we're going to settle for $1 million rather than $500,000. That's not the part of this settlement that's at issue. The part of this settlement that's at issue is one that had you say, this goes, we've exceeded our aggregate limits. You have no interest in saying anything other than that. Well, Your Honor, Gould came to us and said, we have coverage under the umbrella for these losses in the 60s. Firemen Fund's position is we have some ironclad defense to tell them to take a hike. We're litigating with them in the state of California. We're dealing with loss policies. The umbrella policy that they rely on, which they say is integrated, and I'd like to address that in a moment, has declarations which schedule certain limits of the underlying primary. But the operative language of the umbrella doesn't require that an underlying primary aggregate be scheduled, it just doesn't. It talks about the schedule applying the limit applicable to an occurrence, and then it goes on to say, apply any aggregate limit that's been depleted. It doesn't say any scheduled aggregate limit. What do you say you know when you reach it? How do you know when you reach it? That's why I want to talk about this integrated clause which they brought up in their reply brief. The umbrella policy does have a clause at the end that basically says this is the deal. They call it an integration clause. By the way, some of these umbrella policies were missing too. Why don't you answer our question. How do you know what the aggregate limit is? You have to go to the primary policy. That's what umbrella coverage is. There is an integration clause that says... That's perplexing to me in an umbrella policy that states the aggregate limit for property damage. It states its own aggregate limit. Your Honor, let me walk through this. The umbrella policy has an integration clause that says the umbrella policy is the deal. The umbrella policy provides umbrella coverage over something else. It provides two kinds of coverage. One, it applies coverage that applies when underlying coverage is exhausted. And two, it applies coverage that applies if the underlying coverage didn't ever apply. It's two kinds of coverage. That's why it's called an umbrella. You must look at the underlying primary policy under the terms of the umbrella to determine how and when to apply the umbrella. You must. Now, why are only... The problem is they don't exist because your client lost them. Now, how do we tell what that amount is? Your Honor, there's a very established body of law that deals with lost policy situations because it happens all the time in asbestos and pollution where we're litigating about coverage from 50 years ago. Goulds didn't have the policies. We didn't have complete copies. They didn't have complete copies of their own. It's a common situation. What we're told to look for is any secondary evidence that would supply the missing terms. Anything. Expert testimony, standard terms, custom and practice, intact policies, contemporaneous summaries, common sense. We had all of that. It was futile for them to say we had no reasonable basis to pay Goulds under the umbrella policies. There was overflowing evidence that they bought a totally standard liability program for a product's manufacturer. If, hypothetically, all these missing policies contain no aggregate limits or language, would there still be umbrella coverage? It would depend on the situation, the particular... It would depend on the particular loss If the primaries truly had no aggregate limits for product losses and the parties agreed that that wasn't a mistake, then you wouldn't be exhausting that primary policy by adding up different small losses. But that wasn't the case here. The summaries that existed from the 60s said there were aggregate limits in the primaries. Goulds never claimed otherwise. And we're supposed to, according to this reinsurer, we're supposed to tell Goulds, sorry, there's no coverage under your $10 million umbrellas because of the way we read these declarations. Let's look at the facts here, which is that because the policies were lost, you settled this whole thing before you gave them any notice because you settled in 2007 and you didn't give them any notice until after 2008 when you found the reinsurance policy. So all this gets done without them having a clue that it's going on. And it's in that context that I'm still trying to find out what's the aggregate amount? The aggregate limit in the primaries is $300,000. Well, how does that make any sense that the same amount that's the aggregate for a single person then becomes the aggregate triggering reinsurance? I mean, usually the aggregate is a much larger amount. Not always, Your Honor. I understand not always, but we've got a missing policy and you're asking us to assume a kind of curious aggregate here based on what? Your Honor, there were contemporaneous summaries from Gould's own files that show the aggregate limit. It's in the record. There was a summary from 1966. There was a summary from 1971. There was a memo that Utica sent to Gould's in 1966 which was part of the record which showed that it was a $300,000 bodily injury aggregate under the primary. It's a little unclear whether that was really the maximum per person rather than an aggregate for all claims. It's not unclear at all under the summary. And my concern in this is the jury was never asked what was the aggregate policy. They were only instructed to follow the settlement if this was reasonable. That's a different question from, okay, what's the aggregate for bodily injury? Absolutely was a different question. It's the heart of our case in responding to their appeal. Why shouldn't the jury have been asked Why shouldn't you have had to prove and the jury have had to find what the aggregate limit was if this evidence supported that? Because this wasn't a direct insurance coverage case between ourselves and Gould's. This was a reinsurance case between our reinsurer and us. Our reinsurer second guessing our settlement decision governed under the last 30 years of precedent from this court by a follow the settlement standard where the question isn't whether we were really liable to Gould's. The question for the jury is did we act reasonably and in good faith? But this is a reinsurer who's raising that question because it didn't get any notice of this until after the settlement was all done. Certainly if you had had the policy in hand and hadn't given them notice until that date, it would have been late notice. I'm not quite sure how your loss excuses you're not letting them know anything about this for so long. They had a late notice defense, Your Honor. The jury was properly instructed on it. They had to show prejudice under New York law. That was the problem with their late notice defense. My time is up if I may continue. Please continue. They had to show prejudice under the decision of the New York Court of Appeals in Unigard v. North River. They had a prejudice theory which made no sense at all and that was the problem with their late notice defense. We don't... They found that we complied with the contracts and that their late notice defense failed. Well, what they were... What New York law recognizes and please tell me if I've misunderstood this, is that if they don't have adequate policy and practices for retaining and maintaining their policies, then prejudice is Well, not quite, Your Honor. That's not the instruction that was given. Well, not quite. There's two things to say about that. There is dicta from this court's decision in Unigard v. North River in the early 90's that prejudice is required under New York law. That's what the New York Court of Appeals said on the certified question. This court in dicta said if there is some kind of recklessness or deceit that leads to late notice so that would be decided under a different theory of bad faith. It's a failure to maintain practices and policies for maintaining policies and giving notice of them. Does that trigger a presumption? It does not trigger a presumption. They have to show bad faith. They have to show something more than negligence. That's what the dicta said. We objected to that instruction. It's not consistent with New York law. It was given. The court gave the instruction they wanted though he tinkered with it. We heard for the first time on appeal that he ruined it when he tinkered with it but they never told him that during the trial. Late notice was a big part of their case but they had the ability if they proved certain things  regardless of whether our settlement was reasonable or not. And what exactly was the jury asked on that issue? The jury was asked whether we complied with the contract and whether they breached it. What about the notice? What was the jury asked about notice? I don't believe the verdict form went specifically to notice but in the instructions they were told that if there is a proof of prejudice from late notice or if they proved bad faith that they are relieved of their liability. And that was all argued to the jury? Absolutely. Argued to the jury 90 minutes aside. Talk for a minute about your use of the settlement agreement in summation. The dismissal order wasn't hearsay. It wasn't offered for a hearsay purpose. What did you offer it for? We wanted to tell the jury what happened. They were dealing with a follow the settlements problem. They had to get around. They argued to the jury that judges don't just sign these things and I mean the import of the argument as I read it was it's reasonable and they can't argue otherwise. You even suggested that in your argument because judges had signed off on this. I don't know how that's anything other than implying that the reasonableness of this is established by the judges' signatures on the settlement. The context matters, Your Honor. They closed first. They pointed to the dismissal order, which was always part of their case, as exhibit A in their bad faith claim. We're talking now bad faith that goes to follow the settlements, not bad faith in late notice. Bad faith in the original settlement? They said that everything we did with Goulds and that court in California was fraudulent on them from how we mediated to how we worded the settlement agreement to how we sought the dismissal order. We wanted that record in and the judge agreed that record should come in. We didn't stand up in closing and all of a sudden wave around the dismissal order and say, fine, it was reasonable because the judges said. We were responding to their claim that Utica deceived the judges into signing that dismissal order. That's what they said in their closing. Deceived them and this was certainly with the vigor of argument, deceived them into thinking that the aggregate had been reached, into signing off on that the aggregate allotment was reasonable. That was the suggestion is that that had been played and you're saying that no, the judges signing off on it is evidence that there was an aggregate limit reached. The argument was that Utica had misled the judges throughout about whether there was coverage under the umbrella. That's true. That was part of their argument. The fact was Gould's, the judges were never facing any claim by Gould's that there wasn't coverage under the umbrella. Both sides agreed there was coverage under the umbrella. We didn't put the dismissal order in to argue, rule our way because the judges said so. We put the dismissal order in to rebut the claim that everything Utica did had a fraudulent reinsurance purpose and that's why the judge let it in and the whether the judges signed the order or not, there was a mountain of evidence that we acted reasonably. You have to follow the settlement standard. It's so deferential for exactly this reason. We don't get second guessed and an interesting case that they cited in their reply only that we like is called Trustees of the University of Pennsylvania which dealt with a settlement issue between an injured claimant and a policyholder. Policyholder settled, insurer claimed it was unreasonable. There was evidence entered at a jury trial about an underlying settlement being brought to the judge. The settlement was between the policyholder and an injured claimant and very interesting case but the gist of it was on harmless error and it is their burden to show this isn't harmless error was that when you're challenging whether someone had a reasonable basis to that is a almost a lost cause. Of course we had a reasonable basis to pay ghouls under these umbrella policies. That's the program they bought. Why were they buying coverage with $300,000 primary aggregates and then $10 million over it? They're a product manufacturer. They make some pumps for crying out loud. They're not making pumps that blow up and cause $10 million of damage. They make pumps that if they all go wrong, a lot of little claims will eventually eat up and exhaust their primary coverage so they brought an umbrella. This was the expert testimony at trial. This was the summaries from the 60s. The policies were missing, yes, but we get such robust deference under this court's decisions from settling because if we didn't, we would never settle. We would litigate everything to judgment so we wouldn't get this kind of second guessing and have to go through all of it just to collect our reinsurance. Thank you. Mr. Chaffetz, I think you reserved two minutes for rebuttal. Thank you, Your Honors. On the settlement order, the fact that there was an issue of whether the settlement was reasonable does not give them a license to use hearsay, the most prejudicial kind of hearsay, and they put that before the jury. Did you argue that the settlement was fraudulent? We weren't trial counsel. There was a case there was, yes, Fireman's, sorry. Did the counsel below argue that the settlement was fraudulent? They thought that the settlement was essentially fraudulent vis-a-vis the reinsurers and that it was contrived to The settlement on prestige, you're getting blessed by the judges was a contrivance to That the settlement was not a somehow impartial. That the settlement was not a good faith settlement vis-a-vis the reinsurers. So they drafted the factual findings, got the judges to rubber stamp them. Their general counsel said we put those findings in here to make it easier to recover the reinsurance, and they read that to the jury on his direct examination. It couldn't be more prejudicial, and the judge below conflated the fact that this stipulation might have been relevant when it shouldn't have been, since it's just their drafted findings of fact. It's arguably relevant to an issue that we raised. You don't get to prove your case by hearsay just because a document, most hearsay is presented because it's relevant and it's excluded because it's hearsay and because it's prejudicial. Let me come back to the main point. This is excess coverage. Yes, it was an umbrella policy, and there can be circumstances with umbrella policies where you have to see what other coverages were below. That's part of the game. But this is the excess coverage. Not only do you not have to look at the underlying coverage to determine the attachment point, you can't, because the attachment point is defined not in terms of what those policies may or may not say. It's defined in terms of the limits as stated in the schedule to this policy. Is it your position that your client's obligations do not arise until the umbrella policy is reached? Absolutely. That's correct. And to suggest that an umbrella policy, that excess coverage does not have to disclose its attachment point in advance defeats the entire commercial purpose of having umbrella coverage. You have to be able to excess coverage. You have to be able to rely on this document to know insurance is much cheaper the higher it is away from the risk. Opposing counsel just told us that there was a plethora of evidence as to the attachment point from course of dealing, from memos in the files, from summaries. Isn't that true? First of all, is that true or not? There's a plethora of evidence on both sides of that question. The trial judge said that a finder of fact could reasonably conclude that there was no basis for their position. So it's a balanced, and you're not, the purpose of our policy is to prevent having to look at that extrinsic evidence. You're post-trial now. Sorry? You're post-trial and you're in the realm of could any reasonable jury have concluded? I thought I was asked a question as to whether there was extrinsic evidence that might have put someone on notice that there was an underlying aggregate. The judge, there was. But that's irrelevant to whether or not you can consider any such evidence in determining whether this policy attaches. We can't argue the facts with him in my rebuttal in this appellate court. We categorically reject his one-sided, and the trial judge twice or three times rejected that categorization of it being one-sided. He thought it was balanced. Only as to whether it was reasonable to think that the underlying policy had aggregates. Our question never went to the jury and it never should have gone to the jury because you can't have the excess insurance market work unless you can rely upon what's in the schedule. And we showed you case after case where what's in the schedule prevails over the actual coverage that was written below. In cases where the umbrella carrier and the primary carrier were different companies. I want to be sure I understand your position. You agree that there were disputed positions, disputed facts about whether the primary policy had an aggregate limit. But you're saying that whether it did or didn't is irrelevant because your coverage is tied only to the umbrella policy. That's correct. Now you heard your adversary point to language in the umbrella policy that he says, I think, if I've understood him correctly, basically imports